IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|---|---|---|
| v. | : | |
| NATHANIEL COLEMAN | : | No. 12-295-1 |

**MEMORANDUM**

PRATTER, J.                                                              OCTOBER ___, 2020

Defendant Nathaniel Coleman seeks immediate release from incarceration by moving for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). The primary basis for Mr. Coleman's motion is the COVID-19 pandemic and attendant conditions relating to the pandemic as they may affect him. The Government disputes the merits of the motion. For the reasons that follow, the Court denies the motion.

### BACKGROUND

#### I.   Mr. Coleman's Criminal Conduct

On February 11, 2012, Mr. Coleman and two co-defendants, Tyjuan Waters and Stein Scruggs, held up a McDonald's on 914 South Broad Street in Philadelphia. All three defendants covered their faces with masks. Mr. Coleman and Mr. Waters went inside the McDonalds while Mr. Scruggs stayed behind with the getaway car. Inside, Mr. Coleman brandished a 12-gauge shotgun and ordered the employees to lay down on the ground while Mr. Waters stole $2,171 from the safe.

After stealing the employees' cell phones and the McDonald's wireless phone to prevent employees from calling the police, Mr. Coleman and Mr. Waters returned to the car. Philadelphia police officers attempted to stop the car and a high-speed chase ensued. Mr. Scruggs collided head

1

on with another car. Mr. Scruggs, Mr. Waters, and Mr. Coleman attempted to flee on foot, but were apprehended within a few blocks.

A grand jury returned an indictment charging Mr. Coleman with conspiracy to commit robbery which interferes with interstate commerce, in violation of 18 U.S.C. § 1951(a), aiding and abetting a robbery which interferes with interstate commerce in violation of 18 U.S.C. § 1951(a), using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1), and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g). Mr. Coleman pled guilty and earned a 155-month sentence followed by a five-year period of supervised release. Mr. Coleman is serving his sentence at USP Lewisburg, with an anticipated release date of February 20, 2023. He has served approximately 103 months and has credit for good conduct time of approximately 15 months, for total time credit of approximately 118 months. He has incurred two disciplinary sanctions, one for being insolent to a staff member in 2017, and one for giving or accepting money without authorization in 2013.

## II. Mr. Coleman's Request for Compassionate Release

On June 18, 2020, Mr. Coleman submitted a request for compassionate release to the warden, based on his assertion that he suffers from cancer, "bad heart conditions," AIDS/HIV, and asthma. The warden denied his request. On August 19, 2020, Mr. Coleman filed this motion for compassionate release, once again citing "weak heart," AIDS/HIV, and asthma, but changed the "cancer" basis to "concern of cancer." Mr. Coleman's medical records contain no mention of cancer, but do include a reference to a thyroid mass. His medical records also reveal that he suffers from hypertension. At this time Mr. Coleman's conditions appear to be well-controlled, and he receives medication from the medical personnel at USP Lewisburg. BOP records show that Mr. Coleman has never sought treatment for any acute asthmatic episode, hypertension, or HIV. Mr.

Coleman's HIV is asymptomatic, as he has never had an HIV-related illness. Mr. Coleman is prescribed 10 mg of Lisinopril daily for his blood pressure. His medical file states that his asthma is stable and controlled by an Asmanex inhaler and albuterol inhaler.

### III.    BOP's Response to the COVID-19 Pandemic

Because "maintaining safety and security of [BOP] institutions is [the BOP's] highest priority",[1] the BOP has taken significant measures to protect the health of the inmates in its charge. The BOP's Pandemic Influenza Plan has been in place since 2012. BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Oct. 8, 2020). The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i. This plan further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. The BOP began planning for potential transmissions related to COVID-19 as early as January, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, the BOP began to modify its operations to minimize the risk of COVID-19 transmissions on March 13, 2020.

Presently, BOP operations are governed by Phase Nine of the Action Plan. Memorandum from the Bureau of Prisons on Coronavirus (COVID-19) Phase Nine Action Plan (Aug. 5, 2020), available at https://cic.dc.gov/release/summary-bop-phase-9-covid-action-plan (last visited Oct. 8, 2020). The current modified operations plan in this phase requires all inmates in every BOP institution to be secured in their assigned cells or quarters to stop any spread of the disease. Only limited group gathering is permitted, with attention to social distancing efforts to the extent

---

[1] BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited Oct. 8, 2020).

possible, to facilitate commissary, laundry, showers, telephone, and computer access. The BOP has limited the movement of inmates and detainees among its facilities. Moreover, official staff travel has been cancelled, as has most staff training. The BOP is also endeavoring to regularly issue face masks to all staff and inmates and strongly encourages individuals to wear appropriate face coverings when in public areas if social distancing cannot be achieved.

Phase Nine provides for a gradual resumption of residential programming at a reduced capacity, with social distancing measures, and transfers of inmates between institutions and to and from court. Institutions with active COVID-19 cases may make exceptions to programming requirements for the safety of staff and inmates. Legal visits will be permitted on a case-by-case basis and in-person legal visits should be socially distanced or separated by plexiglass. Social visits were just reinstated as of September 30, 2020, and will be non-contact with social distancing enforced.

Inmates who travel outside of the institution, such as for court appearances, should be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with Health Services Division and the CDC's guidance.

As directed by the Attorney General, the BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[2] Pursuant to the Coronavirus Aid,

---

[2] This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

Relief, and Economic Security Act, the BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of the BOP. Pub. L. No. 116-136 § 12003(b)(2). On April 3, 2020, the Attorney General gave the Director of the BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of coronavirus transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. The BOP has pledged to continue monitoring the pandemic and to adjust its practices accordingly to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders. Thus far, the BOP's efforts at USP Lewisburg appear to have been relatively successful. While 85 inmates had tested positive, there are no inmates currently reported as positive.

## LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). A defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf, which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).

In the event the moving defendant complies with the exhaustion requirement, a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons

5

warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[3] but only after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13.2.

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13. In order to find compelling and extraordinary reasons, the policy statement additionally requires a court to find that a defendant is "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal

---

[3] Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

6

conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

## DISCUSSION

Without a doubt, all segments of our society have been experiencing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing",[4] frequent and thorough hand-washing, avoidance of close contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. The Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19 is, resolving Mr. Coleman's motion still calls upon the Court to take into serious consideration the limits imposed pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

---

[4] Some have understandably suggested that this would be better thought of as "physical distancing", insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

7

Mr. Coleman argues that he should be immediately released under 18 U.S.C. § 3582(c)(1)(A)(i) given his medical history of asthma, HIV, hypertension, and "concern of cancer."

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune individual, does not provide a basis for a sentence reduction on its own. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (holding that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering the BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread"); *see also United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit.").

The Government contends that Mr. Coleman's concern that he might contract COVID-19 in a prison environment does not present extraordinary and compelling reasons justifying a reduction in his sentence. The Court must agree.

As demonstrated by his medical records, there is no evidence that Mr. Coleman suffers from a condition that is considered "high-risk." The CDC lists only "moderate to severe" asthma as a possible risk factor, but Mr. Coleman's asthma has been repeatedly described in his medical records as stable and controlled by the inhaler that the BOP provides him. These records do not show any serious symptoms or asthma attacks. Courts routinely deny motions for compassionate release based on similar facts. *See United States v. Williams*, 2020 WL 4756743, at *5 (E.D. Pa. Aug. 17, 2020) ("[T]he medical records do not reflect any serious asthma symptoms or asthma attacks. Accordingly, the Court finds that [defendant's] asthma does not present an extraordinary

and compelling justification for his compassionate release."); *United States v. Slone*, No. 16-400, 2020 WL 3542196, at *6 (E.D. Pa. June 30, 2020) ("[A]n incarcerated person arguing extraordinary and compelling reasons based on asthma which is not moderate to severe is not entitled to compassionate release."); *United States v. Towel*, No. 17-519, 2020 WL 2992528, at *5 (E.D. Pa. June 4, 2020) (determining that mild, exercise-induced asthma that is well-controlled by the facility is not a factor which increases the risk for severe illness due to COVID-19).

The same is true of Mr. Coleman's HIV. It has been described throughout his medical records as asymptomatic, and Mr. Coleman is receiving treatment. The CDC has stated that "we believe people with HIV who are on effective HIV treatment have the same risk for COVID-19 as people who do not have HIV. *McDonald v. United States*, 2020 WL 4516838, at *2 (S.D. Ala. Aug. 5, 2020). Courts have also routinely denied motions for compassionate release based on asymptomatic HIV. *See, e.g., id.*; *United States v. Esmond*, 2020 WL 4915669, at *2-3 (D.N.J. Aug. 21, 2020) ("Defendant's HIV treatment appears to be effective and speculation at this point about what may or may not occur at some point in the future does not constitute a 'compelling and extraordinary' reason for release.").

With regards to Mr. Coleman's hypertension, records show that he takes appropriate medication. The CDC has stated that people with hypertension "might be at an increased risk," but the condition is not considered high risk at this time. *See* CDC, *People with Certain Medical Conditions,* available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/peoplewith-medical-conditions.html (last visited October 8, 2020). Hypertension, even in combination with other conditions, is not generally classified as a factor warranting compassionate release. *United States v. Williams*, 2020 WL 4756738, at *5 (E.D. Pa. Aug. 17, 2020) ("[H]ypertension is not considered high risk at this time."); *United States v. Tartaglione*,

2020 WL 3969778, at *6 (E.D. Pa. July 14, 2020) (hypertension and hyperthyroidism did not place defendant "at a uniquely high risk of grave illness or death if infected by COVID-19" warranting compassionate release).

Finally, there is no evidence in Mr. Coleman's medical records supporting either his alleged "weak heart" or cancer conditions. In 2019 a doctor's report stated that Mr. Coleman's heart appeared normal, and Mr. Coleman did not report any cardiovascular symptoms. And while Mr. Coleman has a thyroid mass, he provides no evidence that this mass is cancerous. Without more, these claims cannot form the basis for compassionate release.

Mr. Coleman also bases his motion on his efforts at rehabilitation while incarcerated. Congress has explicitly stated that "rehabilitation of the defendant alone" is insufficient for compassionate release. 28 U.S.C. § 994(t). Because Mr. Coleman does not present a medical ailment which would warrant release, the Court cannot grant relief based on Mr. Coleman's rehabilitation.

Because Mr. Coleman has failed to present any extraordinary and compelling justification for his compassionate release it is not necessary for the Court to advance to the next step of the § 3582(c)(1)(A)(i) inquiry by assessing the application of the § 3553(a) factors and possible danger to the community imposed.

## Conclusion

For the foregoing reasons, the Court denies Mr. Coleman's motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate order follows.

BY THE COURT:

*Gene E.K. Pratter*
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE